Case No. 18-1303 et al. Exhaustless Inc. Petitioner v. Federal Aviation Administration. Mr. Blair for the petitioner. Mr. Schultz for the respondent. Mr. Blair, good morning. Good morning, Your Honors. May it please the Court. With me at council table is Mr. Steve Endress, CEO of Exhaustless Inc. I've reserved three minutes for rebuttal time. I'm happy to answer any questions, but otherwise I'd like to focus on two issues in particular. First, the orders at issue are unlawful because the FAA skipped notice and comment. Second, the orders are arbitrary and capricious because the FAA failed to consider several key aspects of the problem, including the anti-competitive aspects of the temporary interim measures. There's no dispute here that the FAA's methodology is anti-competitive. At least it would help me. Can you start with your theory of standing? Theory of standing, yes. Yes, Your Honor. We have standing here because our injury is the lost opportunity to compete, which is caused by the orders, as in the safe extensions case, the orders eliminate our opportunity to compete in the market with our congestion solution, congestion reduction solutions. And what do you mean by opportunity to compete? What would happen? What sequence of events would be occasioned if you were successful in your effort? If we were successful, as outlined in our reply brief, Your Honor, the only thing stopping Exhaustless from competing and marketing its services to airports and airports engaging Exhaustless with its services is the FAA's policy of allocating the slots. Because the slots are allocated, the airports are powerless to implement their power to use the two-part fee landing power that they had, that this court found affirmed in the 2010 ATA v. DOJ case, DOT case, excuse me. The airports currently cannot do that because, as that case made clear, there are other regulations that apply to the landing fees, and the airports cannot charge more unless they would have the effect of reducing congestion. And the slot limitations as they are now are not just maximum, no more than 71 planes can take off or land. It's also a minimum as well. So airports cannot charge more for landing fees at peak times because it's not going to affect congestion because the FAA is forcing 71 planes to take off and land during that hour. So the way you spun that out, if you were able to get the orders undone, then you would be dealing directly with the airports? That is one way that we could compete, yes or no. And why would we suppose that the FAA is going to allow that to happen, given all the historical context that's led us to where we are with regard to congestion at these airports? Why is the agency just going to allow this process to unfold without the agency itself being involved? Well, I guess there's two components to that question. One, I guess, is that we would contend that the FAA should not be micromanaging the regulation of the airport. Since the Airline Deregulation Act, the FAA should be using market forces and not micromanaging exactly which planes take off when. But the second part of that question is this speculation of whether the FAA would let that happen. And as we've outlined in the brief, the Teton case and the Pelletier case, it was enough that the party's economic incentives were enough to satisfy the redressability prong of standing. Here, if the FAA were to promulgate an emergency rule, I would say that that's speculative as well. It's almost speculative that we wouldn't have an opportunity to compete. But I guess the reason I'm asking is that it seemed like everything in the case until your reply brief was geared around a universe in which the FAA would retain you to do the slots. And then the theory in the reply brief is that, no, no, no, it's not that anymore. It's not that the FAA would use, would at least allow us to use our product to administer everything at these airports under some arrangement with the FAA, but the FAA would just drop out and we'd be dealing directly with the airports. And would you say that there's at least been a shift in thinking, or do you think that this was the thought all along? I would say it was a shift in emphasis, Your Honor. As we tried to explain in the reply brief, and perhaps not clearly enough, that we still believe the ideal solution would be the FAA implementing the entire standard, including all the components. And that is more in line, to Your Honor's last question, more in line with the history of the FAA spending 20 years looking for an FAA-centric solution to this problem. In the reply brief, we shifted emphasis to make sure it was clear that that's not the only way that the exhaustless could compete here. There are many ways that exhaustless could compete here that would not require the FAA to promulgate a new rule or enforce exhaustless auctions, et cetera. That's one way that it could. And I'd also point out that in the CC distributor case, the court found that whether the petitioner was, you know, the chances of succeeding once they had the opportunity to compete was an irrelevant factor. So, again, we're not asking for the court to compel anyone to implement the exhaustless solution. It's that we should have an opportunity to compete. Last question along these lines. So then in this universe, what happens to the petition for rulemaking that's pending? So there's just two separate tracks, basically? There are two separate tracks. That was filed in May. The FAA has rules requiring that they respond within six months. They did not. But as we highlighted in the briefs, we have not filed a petition for writ of mandamus. That separate petition for rulemaking, we would say, is outside the scope of this case. And, you know, directly to your question. But it's only outside the scope of the case because of the theory that you developed in your reply brief? Because otherwise it seems like, and you might have other arguments, but it's well within the scope of the case because you'd be asking the FAA in that petition for rulemaking, basically to do the thing that seemed like would be the ultimate outcome, if you put aside direct negotiations with the airports, would be the ultimate outcome anyway because the FAA then would be in arrangements with you to utilize this product. Well, Your Honor, the FAA could proceed in that way. I would say it's outside the scope of this case in the sense that we've not filed a petition for writ of mandamus. So we're not asking the court to compel the FAA to promulgate the rule that we've petitioned for that rulemaking. Right. That's one avenue. And one of the reasons we went into that level of detail in our opening brief is to show that we have standing. We're not just a citizen off the street that has an idea and wants to complain about all the things that the FAA has done in the last 12 years. Exhaustless is a party that has a third party market based proposed solution. They have tried to engage with the FAA to convince the FAA that this is the best solution. The FAA has ignored that. But that's outside the scope of this case because we're not asking the court to force the FAA to implement the proposed rulemaking solution. And there are other ways that exhaustless could compete and help solve the congestion problem without any further action of the FAA. As soon as the FAA stops handing out slots for free. So. Back to the anti-competitive methodology again, it's it's it's undisputed that it is anti-competitive. Everyone agrees about that. It's also undisputed that the FAA acknowledged in the 2006 or the first order that it knew that Congress mandated the phase out of high density rule because of this anti-competitive methodology. And and I want to just a brief sidetrack here. The word phase out in the Wendell Ford Air 21 Act is not because Congress intended in January of 2007 that that would be the beginning of a gradual phase out of the HDR methodology. The word phase out is there because Congress required the the to eliminate the HDR methodology at O'Hare in 2002. And the Congress gave FAA another four and a half years to solve the problem at JFK and LaGuardia. So. As of January 1, 2007, there should not be this anti-competitive methodology that is allocating slots at JFK and LaGuardia. The FAA has acknowledged from the beginning that this is anti-competitive and it's imperfect. And that it was never intended as a long term solution. The 2006 order says that they expected to develop a quote better policy with help with help from notice and comment. And that the final order quote should establish a more rational basis and quote for regulating flights at LaGuardia. And Mr. Blair, you're again on the standing. There are some third parties that would have to act in a way conducive to your client in order for your client to benefit from an order from this court, such as the airports themselves and how they allocate gates and resources. There's some mention in the government's brief of international agreements that are timed in reliance on slot availability by the International Airlines slot availability of New York. And how how is it that those third party actions don't render the relief that you seek to speculative contingent? Good question. I would say that the as to the airports, they have the same financial incentive that was found sufficient in Teton and the Pelletier. The economic incentive to cooperate was found sufficient to satisfy the addressability prong there. The airports would have an additional revenue stream if exhaustless were permitted to help them solve airport congestion. What what exists now is a complete market failure from from every perspective. Right. Passengers can pay more to go in the shorter security line. They can pay more for more leg room. But there's no amount of money that anyone can pay to increase their chances of arriving when they're supposed to arrive. Right. Same from the the airlines perspective. They would like to provide better service, but they can't provide better service. And one example of that is when New York passed the passenger Bill of Rights, the ATA sued to to challenge that. Right. It's not because airlines like keeping people in airplanes for hours on end. It's that they understand that that's an unfortunate reality of today's system. Sometimes that happens and they have no power to solve it. In the ATA, the DOT case in 2010, there's discussion of individual airlines don't have the power to solve this problem. It's the tragedy of the commons. If one airline says, oh, I'm going to fly less during this time. Other airlines are just going to fill that void. And I've run into my rebuttal time. So I'd like to reserve some time for rebuttal unless there are any questions now. Thank you. Thank you. Please, the court. Benjamin Schultz on behalf of the FAA. I want to start by talking about standing and specifically about the standing theory that petitioner really brings out in their reply briefing here in this court, because that's a theory of standing that assumes that airports have the power of their own accord to enact the exhaustless scheme. If the FAA orders were vacated, that is legally wrong. And I'd like to explain several reasons why. The first reason is that it's preempted by federal law. And there's a key Supreme Court case here. City of Burbank versus Lockheed Air Terminal. And that's 411 U.S. 624. It's a 1973 Supreme Court case. And that case stands for the proposition that when the FAA manages things like the efficient use of airspace and safety, and it's also about noise regulation, that that's an area where the states have no power to regulate. And both of the airports at issue here, LaGuardia and Kennedy, are managed by a bi-state entity that will be acting pursuant to New Jersey and New York law. And if you read that Supreme Court case, I just want to make clear that although you'll read and you'll see that it's about a noise regulation, one of the premises that the Supreme Court starts with to go on to explain why the noise regulation is preempted, is it says, of course, things like managing the efficient use of airspace and managing the safety of the airspace are things that are preempted. And then it goes on to say that the noise regulation interacts with those two. And so the noise regulation is also preempted. But since the premise of that is that the efficient regulation of airspace is something that the FAA has preemptive power to do, that's why this is something that the airports couldn't do. So on that, if the FAA may have preemptive power, but if it's not exercised, then... It's field preemption, Your Honor. That's correct. Your Honor, the Supreme Court said that what that statute does is it completely eliminates the ability of the states to regulate airspace. So is that what really happens in the real world? So is there no airport that has a separate agreement about how it's going to... Or a separate sort of arrangement that's not sanctioned, officially authorized by the FAA's involvement? Your Honor, I'm unaware of any airport that has managed congestion in the way that Petitioner is talking about. Now, I do want to talk about... What do you mean by that, in the way that they're talking about? So I think what you heard Petitioner reference in his argument today was certain congestion management fees. And that's a separate issue. What that is, is that... And there's a bit of history here, and I apologize that because this is something that came out in our reply brief, there's a lot of detail. And I want to make sure that the Court gets it. But if you read this Court's 2010 opinion in Air Transport Association v. Department of Transportation, that's 613F3206, then there are things called grant assurances that airports who take federal funds have to make to the FAA. And the Port and JFK and LaGuardia are airports that have received federal funds in this way, and they've made these grant assurances. And this Court has explained that one of the assurances is that the airport be available for public use on reasonable conditions and without unjust discrimination. And this Court has explained that that means, among other things, that the airport can only charge, quote, reasonable fees to airlines. And then there's a separate statute, and this is 49 U.S.C. 47129B2. And that statute gives the Secretary of Transportation authority to establish standards or guidelines to use when determining the fees are reasonable. And then if you go look in those standards and guidelines, which are published in the Federal Register, and those are what was at issue in the air transport case, those standards and guidelines explain that in certain circumstances, airports can charge landing fees to airports that in some way take congestion into account. But it is a very, very narrow way that they are permitted to take congestion into account, because at the end of the day, what the airport charges cannot exceed the reasonably allocated costs to the airport of having the airport land. And that is in no way what Exosilus is proposing to do. Theirs is not a cost-based system. Theirs is a pure market-based system. They want to have an option in which the price of a slot will just be whatever the market would bear, which is in no way authorized by these guidelines. And if you look, in fact, at what the guidelines are saying, all they're saying is that if you want to have this congestion management fee, which is permitted under the current system, by the way, these congestion management fees have a different way of computing costs in certain congested airports, so that, for example, if an airport is really congested, some of the costs that you can include as part of the airport's underlying costs are the costs of building outlying secondary airports. And there's a methodology there for how you take that into account. And, again, no airport has even voluntarily done that, which is permitted under the current system. So it can't be that what they are asking for here is for the Port Authority, which manages JFK and LaGuardia, to have the ability to charge those landing fees. If the Port Authority wants to do that, it can do that. It just has elected not to do that for whatever reason. What they're proposing is a wholly different, not cost-based system. It's a market-based system, and it's not permitted. It would be an unreasonable fee within the meaning of that prohibition. So I think that just shows right there why the airports, for two separate reasons, preemption and the grant assurances, would be wholly unable to implement the exhaustless solution. There's actually a third reason that separately legally bars the solution. And that's because if you look at what they're proposing, it's not just one option. It's two. They're proposing two interrelated options. And the second option is this congestion premium that passengers are supposedly going to pay. The problem is that if the way you implement that premium is via the airport, so in other words, the airport has been requiring the airlines to charge these premiums to the passengers, you run smack into the prohibition of the Anti-Head Tax Act. And that's 49 U.S.C. 40116B. And with exceptions not pertinent here, that says that various state entities, including bi-state entities, which is the Port Authority, quote, may not levy or collect a tax, fee, head charge, or other charge on, among other things, an individual traveling in air commerce, the transportation of an individual traveling in air commerce, the sale of air transportation. And that's exactly what exhaustless is proposing. So, you know, if they want to say that the FAA should implement the solution, we can talk about all the reasons why they lack sanity to do that. But it can't be the airport. So just as a matter of conceptual architecture, so what you've raised is three legal obstacles to their getting home on their theory of addressability that surfaced in the reply brief. I think usually under our decisions, the fact that there may be a legal obstacle remaining doesn't mean that there is not redressability with respect to a legal obstacle that's eliminated, because you give the plaintiff the benefit of the doubt on whether they're going to prevail ultimately on some merits theory that might carry them through some other legal obstacles. Well, that's actually not this court's case law, and we've actually cited two of the cases in our brief. Let me point you to the correct page. This is, I think it's the Delta construction case. That was a situation in which you had somebody who was challenging a regulation, but there was a consent decree that independently barred it, and the court found that they lacked sanity because eliminating the regulation would not be enough. And then there is one additional case that we cited. This is on page 21 of the government's brief. I'm sorry, the Crete Carrier Court was about a consent decree independently barring something, and the Delta construction was a situation where you had to challenge to one EPA regulation, and then there was another regulation that also independently barred relief. And again, because the petitioner was only challenging one of those regulations, the court held that they lacked sanity. So then your view of the doctrine is that we actually go ahead and address the merits of the remaining legal obstacles in our first decision to decide whether there's addressability. That's how you read those decisions. I mean, if the court wants to say that they haven't waived this new theory by not bringing it in their opening brief, do you think that one way that the court could reason this out is it could say, you know, because of preemption or because of the grant assurance or because of whatever other legal reason, then you lack sanity because there is no way to get the relief that you want, even if the orders are vacated. And is there anything factually? So I'm not saying I don't buy that argument. Sure. But is there anything that is a matter of real world on the ground facts that would pose what the agency would view to be a significant obstacle in the way of proceeding in the way that? Sure, absolutely. I mean, one of them is that the operator of these two airports, the Port Authority, one of the entities that sued the agency in 2008 when it had a much more modest slot auction regime. And if the Port Authority was willing to sue over a system in which you had only about 5 percent of the slots allocated versus via an auction, it's hard to imagine that the Port Authority would be willing to countenance petitioner's solution. And that's just the slot auctions. That's to say nothing of all the international facts, all the practical problems that we've addressed. I'd be happy to address any more of the standing or the merits if the court has questions. Otherwise, I think it's all been adequately addressed. Is progress being made? I mean, it is striking to look at the amount of time that's passed and the problems seeming to be intractable. Is there any comfort out there that the FAA, if cases like this aren't allowed to proceed, is going to find a way? Sure. Well, Your Honor, it's my understanding that the FAA does want to have a permanent rule, and I don't know how long that will take, but that is their desire. And if it gives the court comfort, our argument is not in any way saying that if there's an airline out there and they don't have slots at LaGuardia and Kennedy and they want them, or they have a certain number of slots at LaGuardia and Kennedy and they want more, we're not saying that they can't bring such a challenge. It would seem like they are directly regulated by this regulatory scheme. What we're saying here is that this is an entity that is not regulated by the scheme. It doesn't say it wants slots. It doesn't say it flies in and out of LaGuardia. It's just saying we think we can manage congestion better than the FAA. All we're saying in this case is that that entity lacks standing. Thank you. Thank you. Does Mr. Blair have time left? I think he does. Okay. Ferris, I want to address maybe the last point first about other periods could come in. I think that that is an illusory consideration at this point, given that there's already been 12 years of delay on top of the six years of delay that they didn't find a way to come up with a permanent solution when Congress mandated the elimination of this anti-competitive methodology by 2007. In fact, they've never actually defended the merits of these temporary interim solution anti-competitive measures. The best that they've ever said is that it's better than nothing. And every time that they have tried a proposed permanent solution or a long-term solution, they've said that the interim measures are anti-competitive and they're not good enough, and the General Counsel for Department of Transportation testifying that it's not an efficient way to allocate resources and that government shouldn't be picking winners and losers and that the system, without using market forces, encourages incumbent carriers to exclude everyone else. And this idea that other carriers could come in, the current orders go for another two years, and we've already passed the 60-day point to petition for review of those orders, so we have to live with these for another two years and another carrier could come in then, that on the surface seems reasonable. Oh, just have a carrier come in. But the carriers can't do that for at least another two years. They could petition for a rulemaking. They could petition for a rulemaking, and given the FAA's history, you know, I'm not optimistic that that would move very quickly, and so that may even take longer than waiting two years to challenge the next extension of these temporary interim measures. I mean, it's not clear which way that cuts. It seems like this is a complicated problem. And when they've tried, they've found it to be harder than maybe Congress realized and then the agency maybe at first realized. Well, Your Honor, that reminds me of the Nader case where that was a very complicated case involving tariffs, cross-subsidies, and this court said that nine years is long enough for any agency to decide any issue. I mean, that case had all the same elements. The agency was claiming that, you know, conditions on the ground are changing and that it's very complicated and it seemed kind of similar. They were doing, you know, a phase. They would try something and then pull it back and then try that. And the court said, no, at 10 years, there's this risk that you're going to lose public confidence and the regulatory system is going to break down because the public and the industry can't wait 10 years for agencies to make tough decisions. On the new arguments that have been raised here today, I just want to say that the 2010 ATA case says that airports can use this authority, one, and two, it says that it's entirely reasonable to expect airlines and passengers to pay more to fly at peak times. As to the third point about the second option that opposing counsel mentioned, again, that is part of the proposed petition for rulemaking that's outside the scope of this case. Again, Your Honor, I would not say that it was a shift in theory. I would say it was a shift in emphasis. We had to include that and wanted to include that to show that this was a serious effort. This is a serious proposed solution. The FAA can accept or reject it on the merits, but they have not done that. And they have not made a serious enough effort to try to come up with a long-term solution. They keep kicking the can down the road, down the road with these supposed temporary interim measures that everyone agrees are anti-combatant. All right. Thank you. Thank you.
judges: Henderson, Srinivasan, Pillard